PHILLIP L. FLEMING V. STATE

No. 34,636. May 30, 1962

*C. C. Castle* and *Ralph Chambers,* Houston, for appellant.

*Frank Briscoe,* District Attorney, Houston, and *Leon Douglas,* State's Attorney, Austin, for the state.

McDONALD, Judge.

The offense is murder; the punishment, ninety-nine years in the penitentiary.

The evidence shows that appellant and the deceased were husband and wife, having been married in August, 1958; that since their marriage a number of separations and reconciliations were experienced; that the deceased owned a rooming house located at 614 Avondale in the city of Houston on the date of her marriage to appellant; that shortly after their marriage a portion of the house was reconstructed to provide for a private club where alcoholic beverages were served; that the club was damaged on several occasions by appellant after he had arguments with his wife; that a short time prior to June 4, 1961, the alleged date of the offense, appellant and the deceased, while separated, mutually agreed to a divorce; that on June 3, 1961, appellant and a woman companion journeyed to Galveston Beach, returning to Houston around midnight; that after saying goodbye to his companion appellant started home when he decided to stop at 614 Avondale; that he went into the yard and tried to see in various windows in order to view the happenings inside the house; that he looked through some French doors, saw his wife and, later through another window, observed three men with her; that appellant went to a bathroom window, removed his cowboy boots, climbed a tree, and gained entry into the house; that he passed through the club portion of the house, where he crawled past a man sleeping on a couch and retrieved a gun from the fireplace where he had hidden it before the last separation; that appellant entered the darkened bedroom of the deceased and ran up to the bed where she was lying and shot her in the head; that the police and an ambulance were called; that upon arriving at the scene at approximately 4 o'clock, A.M., a few minutes after the shooting, the police officers observed appellant going away from the

house; that appellant was stopped and, in company with the officers, returned to the house, where the officers found the deceased lying in her bed, clad only in panties, and with blood coming from a wound in her head; that a search of appellant revealed a pistol loaded with five live rounds and one spent hull in his right front pocket, which was introduced in evidence—without objection—as State's Exhibit No. 9.

Dr. W. W. Coulter, a licensed physician who performed work on bodies of deceased persons for the Harris County Medical-Legal Department, testified that he conducted an autopsy on the deceased's body, which revealed "a gun shot wound on the right cheek, one inch lateral and one-half inch above the angle of the mouth on the right." The doctor stated that in his opinion death was caused by "Gun shot wound lacerating the brain and cerebral hemorrhage." He further testified that there were "powder burns three-eighths inch in diameter" around the edges of the wound and that an analysis of the deceased's blood showed an alcoholic content of .225 per cent.

E. H. Knowles, a member of the Harris County sheriff's office who worked in the field of identification and testing of firearms for ballistic purposes, testified that he test-fired State's Exhibit No. 9 and found that in order to leave a powder burn three-eighths inch in diameter the pistol would have to be fired from a distance four to eight inches away and in his opinion the pistol would be closer to four than eight.

Other witnesses called by the state testified that the deceased drank occasionally but not to excess.

Appellant, testifying as a witness in his own behalf, admitted the matrimonial troubles with his wife, which he said were caused by her excessive drinking; that when he saw his wife with a man who had a gun in his hand he became frightened for her safety; that he entered the house through a bathroom window, got the gun which he had previously hidden, placed it in his left hand, reached over to turn on a light, and as he entered his wife's bedroom a hunched figure jumped at him; that he fell down near the bed where his wife lay, causing his left hand to hit the bed; that he heard a "bang" and, after a short conversation with the man appellant had previously seen go in the bedroom, discovered that his wife had been shot. He further stated that the deceased had pointed a gun at him several times previously and that some of their problems were caused by the disciplining of his fourteen-year-old step-son. In his confession, which was admitted in evi-

dence as Defendant's Exhibit C, appellant stated: "I didn't know that I had shot my wife until I saw the blood on her right cheek. Then I looked at the gun and I didn't have my finger in the trigger slot. I called the police and I waited for them to come." Appellant further testified that he loved his wife and did not intend to kill her but only entered the bedroom in order to protect her.

Several witnesses were called by appellant who testified that the deceased on prior occasions had pulled a gun on appellant and that she was a heavy drinker.

The jury resolved the disputed issue of guilt against appellant and we find the evidence sufficient to sustain their verdict.

No objections to the court's charge appear in the record but several formal and informal bills of exception are present.

Appellant has four formal bills of exception, each of which complains of certain questions asked by state's counsel. We shall set forth the testimony pertinent to the bills and discuss them together as they concern related matters:

Bill No. 1: Redirect examination of state's witness Drucker:

"Q. Do you know whether or not Philip L. Fleming is a homosexual? A. No sir."

Bill No. 2: Cross-examination of appellant:

"Q. One of Mr. Castle's (defense counsel's) first questions to you was what was your problem with your wife and you answered that her intoxication had quite a lot to do with it, her heavy drinking. A. Yes, sir.

"Q. Isn't it true that you are a homosexual and that had much to do with your problems and the fact that you built this lounge and entertained other homosexuals there?"

Bill No. 3: Cross-examination of appellant:

"Q. Do you recall the question being asked you what was your problem with your wife and my question to you now is wasn't one of the greatest problems and the greatest difficulty between you and your wife the fact that you are a homosexual and you built this lounge and catered to homosexuals there?

"The Court: Break that down.

"Q. The fact that you are a homosexual?"

Bill No. 4: Cross-examination of appellant:

"Q. Isn't it further true that part of the difficulty for you and your wife and the reason you separated on this last occasion was the fact that you introduced Leslie Ashley and Carolyn Lima to the — to Tones over there, those people met in your lounge?"

From the record we find that appellant properly made objections to the questions contained in Bills of Exception Nos. 1, 2, and 3, requested that the jury be instructed not to consider them, and made a motion for mistrial, all of which actions were by the court overruled, and that appellant excepted to the rulings. In Bill of Exception No. 4, the court sustained appellant's objection and instructed the jury not to consider the question for any purpose, but denied the motion for a mistrial, to which action appellant duly excepted.

A further examination of the record shows that appellant's counsel, during cross-examination of state's witness Nelson, who was a roomer at 614 Avondale and was the person in the deceased's bedroom on the alleged date of the offense, asked the following: "Had anyone told you that place was a bachelors quarters for queers?" Then upon cross-examination of state's witness Drucker, also a roomer at the boarding house, the following was asked: "In that last two or three weeks before June 4 had that place accumulated one, two or more homosexuals?" to which the witness answered "No sir," and was then asked: "Are you speaking for yourself?"

While the testimony adduced at the hearing on the motion for new trial reflects that the Lima-Ashley case was a highly publicized murder trial conducted between May 15 and May 24, 1961, in which each defendant received the death penalty, we are unable to agree that the state's questions propounded about the case and concerning appellant's homosexuality injected such highly inflammatory and prejudicial matter into his trial that it denied him the right to a fair trial. The record affirmatively reflects that the questions were asked in good faith.

Under Art. 1257a, V.A.P.C., the state was justified in asking the questions in order to rebut appellant's testimony that the

trouble between him and the deceased was due to her heavy drinking, by showing that the trouble was actually a result of appellant's homosexual tendencies. Mallory v. State, 133 Texas Cr. Rep. 50, 106 S.W. 2d 317.

Appellant was the first to go into the subject concerning whether or not the private club was a hang-out for homosexuals and as to the cause of the strained relationship between him and the deceased. Appellant cannot be heard to complain of the state's action in further probing into this area which he had opened.

We have examined the rather lengthy statement of facts in light of appellant's informal bills of exception and we perceive no reversible error therein.

The judgment is affirmed.